IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JUDITH Q. CHAVEZ, KATHLEEN CHRISTIANSON, ORALIA GARCIA, and MARRIETTA JONES, individually, and on behalf of all similarly situated registered nurses employed by Our Lady of Lourdes Hospital at Pasco, d/b/a Lourdes Medical Center, | ) ) ) ) ) ) ) ) | No. 33556-9-III |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OUR LADY OF LOURDES HOSPITAL AT PASCO, d/b/a LOURDES MEDICAL CENTER and JOHN SERLE, individually and in his capacity as an agent and officer of Lourdes Medical Center, | ) ) ) ) ) | UNPUBLISHED OPINION |
| | ) | |
| Respondents. | ) | |

FEARING, C.J. — Marietta Jones, Oralia Garcia, Kathleen Christianson, and Judith

Chavez, present or former nurses at Pasco's Lourdes Medical Center, sue the hospital and

its administrator, John Serle, for allegedly failing to provide nurses with rest periods and

meal periods and failing to pay wages owed as a result of the denial of the periods. The nurses appeal from the trial court's refusal to certify the lawsuit as a class action. The trial court ruled that the requirements of CR 23(a) were met, but that the nurses failed to establish one of the three alternative prerequisites under CR 23(b), including predominance and superiority as required by CR 23(b)(3). Because the trial court is in the best position to determine whether a class action is the superior method of resolving a lawsuit, we defer to the trial court and affirm its denial of certification. We conclude the trial court did not abuse its discretion in this important decision.

## FACTS

Lourdes Medical Center is a nonprofit hospital located in Pasco and serving the Tri-Cities region. The hospital maintained or maintains nine departments: an emergency room department, an obstetrics and birthing department, an intensive care unit, a medical-surgical unit, a same day surgery unit, gastrointestinal services department, a rehabilitation center, a post anesthesia care or observation unit, and an operating room department. In June 2013, the hospital, for financial reasons, closed its obstetric unit. Lourdes employs more than one hundred registered nurses, on a full-time, part-time, and per diem basis. Most nurses work twelve-hour shifts.

This lawsuit concerns how Lourdes accounted for nurse's work time and afforded meal and rest breaks. Because the sole issue on appeal concerns certification of a class action, our statement of facts focuses on facts relevant to certification more than facts

2

relevant to the underlying causes of action against Lourdes Medical Center. Still the facts regarding the substantive claims hold relevance. The nurses claim that: (1) Lourdes systematically failed to record and compensate nurses for missed rest periods, (2) the hospital failed to provide scheduled rest periods as required by law and its own policies, (3) the hospital failed to compensate nurses for on call meal periods, (4) Lourdes failed to provide nurses with a second meal period during twelve-hour shifts, and (5) Lourdes failed to compensate nurses for missed meal periods by discouraging nurses to report missed meal periods. Although we do not mention Lourdes' administrator John Serle again, the reader may assume that our analysis of claims against him mirror our analysis of claims against Lourdes Medical Center.

The order denying class certification omits a reference to the declarations and affidavits that the trial court reviewed when considering the motion for certification. Therefore, we consider all testimony regardless of whether the testimony addressed a summary judgment motion or the class certification motion. The parties inundated the trial court and inundate us with declarations and deposition excerpts, not that there is anything wrong with that. The nurses' testimony focuses on the rest period, meal period, and worktime accounting at the hospital. Lourdes' testimony focuses on differences between schedules and tasks of individual nurses and nurses by department and by shift. The declarations from the respective parties and their witnesses often conflict.

The parties agree that Lourdes Medical Center utilized a web-based timekeeping

3

system called Kronos to record employee work time. Employees used Kronos to clock the beginning of work and clock the ending of work. Kronos automatically deducted thirty minutes from an employee's compensable time for a meal period for any shift longer than five hours. When an employee clocked out, the employee could account for a missed meal period by canceling the automatic meal period deduction. When an employee reported a missed meal period, Lourdes paid for the half hour at the appropriate regular or overtime rate. The Kronos system did not record rest periods or missed rest periods.

Lourdes Medical Center maintained no policy that directed nurses to report missed rest breaks to the hospital payroll office and had no formal process for a nurse to report a missed break. Before March 2013, the hospital had no knowledge of any nurse being paid for a missed rest period, maintained no policy that provided for payment for a missed rest break, and never informed employees of the right to receive additional payment for a missed rest break.

We now outline testimony of the plaintiff nurses and their witnesses. We will later outline testimony of Lourdes Medical Center's witnesses.

According to plaintiff nurses, a Washington regulation prohibits a nurse assigned to a patient of abandoning the patient and requires every nurse to transfer a patient's care to another qualified nurse when leaving an assignment. If a Lourdes Medical Center nurse abandoned a patient assignment without a transference, she would suffer discipline.

4

This rule imposes an obstacle for a nurse with a patient assignment from taking a rest break. Whether a nurse exercises a rest break depends on whether the hospital provides her with another nurse to transfer patient care or the fortuitous event of no patient to care for during a break period. The hospital maintains no procedure of relieving nurses assigned to a patient's care.

Lourdes Medical Center generally assigns nurses to twelve-hour shifts. The hospital did not allow nurses two meal periods during these shifts. The Kronos time electronic system failed to note that nurses, on this half-day shift, should receive two meal breaks. The hospital maintained no system to report missed second lunches. Nurses testified that they often worked a twelve-hour shift without a second meal break.

According to plaintiff witnesses, a Lourdes Medical Center employee subjected herself to discipline if she worked overtime without authorization. Therefore, if a nurse missed a meal period and pressed the deduct cancelation button with the result that she worked overtime during a pay period, the hospital might discipline her. Nevertheless, plaintiffs Oralia Garcia and Marietta Jones testified that every time they reported missing a meal period, the hospital paid each at the appropriate rate, which testimony may conflict with the hospital's concession that no payment occurred before 2013. Garcia and Jones also respectively testified that the hospital never disciplined them for missing meal periods or reporting missed meal breaks.

5

Oralia Garcia worked as a registered nurse in Lourdes Medical Center's emergency department from 2005 to June 25, 2012. She sometimes assisted in the ambulatory unit. The hospital claims that each of its nine departments discretely trained its department nurses regarding rests and meals. Garcia testified that emergency department nurses never received unit specific training on using rest and meal periods. She was unaware of unit policies that cover rest and meal periods.

As part of its defense to this lawsuit, Lourdes Medical Center contends it met its obligation to allow an employee a fifteen-minute break for every four hours worked, if the employee periodically took small breaks from work duties and those small breaks totaled in time fifteen minutes. Lourdes calls these breaks "intermittent" or "mini" breaks. Presumably, under the hospital's theory, if a nurse rested by closing her eyes for ten seconds, those seconds counted toward a fifteen-minute break. According to Oralia Garcia, Lourdes Medical Center management told her, upon her hire, that she would receive two fifteen-minute minute block rest periods in a twelve-hour shift. Management never suggested to her that she take rest periods in smaller increments of time that, over the course of the day, would equal a half hour. Oralia Garcia conceded sometimes patient flow allowed emergency room nurses to enjoy small incremental breaks, chat about personal matters, surf the internet, check e-mail, read magazines or newspapers, or eat a snack.

6

According to Oralia Garcia, she frequently missed rest periods. The hospital never assigned another nurse to cover for her during a break. She never observed any nurse transferring duties regarding a patient to another registered nurse during a rest break. Garcia averred that the nursing commission and Lourdes Medical Center held a nurse responsible for the care of a patient even during a time that the nurse rested. Therefore, emergency room nurses feared taking breaks.

Melissa Linfoot signed a declaration, in which she testified that emergency room nurses enjoyed rest breaks. According to Oralia Garcia, Garcia worked with Melissa Linfoot for over three hundred and fifty shifts in the emergency department. Garcia challenges the testimony of Linfoot. Garcia observed Linfoot on many occasions work without exercising rest or uninterrupted meal breaks.

Oralia Garcia testified that she never reported a missed rest period or received additional compensation for a missed period. Hospital management never instructed her to contact her supervisor to report a missed rest period. When Garcia worked in the ambulatory unit, unit manager Dee Hazel told her that missed rest periods were lost time.

According to Oralia Garcia, Lourdes Medical Center never scheduled rest periods for nurses. Garcia never refused to exercise a break or rest period when the hospital arranged for a qualified nurse to assume patient responsibilities under protocol. Garcia once refused to transfer a patient's care to a nurse who lacked required certifications and

7

needed training.

Oralia Garcia averred that, despite working twelve-hour shifts, Lourdes Medical Center afforded her only one unpaid meal period. She further testified that she missed ninety percent of her meal periods. She never noticed another nurse receiving two meal breaks in a half-day shift. Garcia could not leave the hospital during meal breaks. The hospital required her availability at all times to respond to emergencies and questions concerning patient care.

Lourdes Medical Center claims that it utilized Go Where You're Needed (GWYN) nurses, or nurses that floated from department to department to relieve nurses for rest breaks. Garcia denied that the hospital employed GWYN nurses to allow nurses breaks.

Judith Chavez worked for the Lourdes Medical Center obstetrics department on three twelve-hour shifts per week until the department closed in 2013. According to Chavez, her charge nurse, during orientation, instructed her she must stay on the hospital premises during meal periods in order to respond to emergencies. Judith Chavez testified that family members sometimes brought her food at work during busy times when she lacked thirty minutes of uninterrupted time to eat or when the hospital cafeteria was closed. The family members deposited the food at the nurses' station because she attended to patients and could not leave the obstetrics unit. She sometimes watched a fetal monitor in the break room when exercising a meal period, for which she received no pay. Judith Chavez also testified that she had no knowledge that she could cancel the

8

automatic meal period deduct programmed into the Kronos system when she needed to stay at the hospital or when work obligations interrupted a meal.

Judith Chavez had never heard of Lourdes Medical Center' terminology of a "mini break" or "intermittent break" until filing this lawsuit. Clerk's Papers (CP) at 144. Chavez testified that at times she made personal phone calls and conversed with coworkers, but these events occurred when she had a patient assignment and was expected to provide patient care for a laboring mother.

Judith Chavez testified that Lourdes Medical Center never offered her a fifteen-minute rest period during which she held no duties. In order to relax, she would need fifteen minutes of uninterrupted rest after she transferred responsibility for a patient to another nurse, not an occasional minute when under assignment. Chavez never transferred care of a patient to another nurse in order to enjoy a fifteen-minute respite. No one ever covered for Chavez during a rest period or a meal period.

Judith Chavez testified that Lourdes Medical Center never informed her that she could report a missed rest period for additional compensation. The hospital never instructed her to contact any supervisor if she missed a rest period. After she filed suit, Lourdes Medical Center instructed her not to claim any rest periods even if she received no fifteen-minute uninterrupted repose but experienced intermittent brief rests.

According to Judith Chavez, despite working only twelve-hour shifts, she never received two meal breaks. Lourdes Medical Center informed her she could take only two

9

fifteen-minute breaks, not three, during a twelve-hour shift. Chavez denied any obstetrics unit specific policies with regard to rest and meal breaks.

At the beginning of this suit, Marietta Jones worked as a registered nurse in the observation and pre-admit units of Lourdes Medical Center. Earlier in her career, Jones worked in all other hospital units, except the operating room. Jones served as a charge nurse in the medical-surgical and the obstetrics departments. She usually worked twelve-hour shifts.

According to Marietta Jones, Lourdes Medical Center management told her that the hospital did not pay for missed rest periods. Hospital management never informed her that she could report a missed period. Therefore, Jones never complained about missed breaks. The hospital never mentioned to Jones the concept of a mini or intermittent break until after the filing of this lawsuit. The hospital then instructed Jones not to report missed rest breaks if she received intermittent breaks. Jones never received unit specific training regarding rest periods and knows of no policies that apply only to a department.

According to Marietta Jones, the obstetrics department lacked a nurse to cover for another nurse exercising a rest break. Contrary to testimony of a supervisor, Jones never refused a rest or meal period when offered. Once Jones' supervisor assigned another nurse to relieve her during a lunch break, but the substituting nurse stated she could only assist for ten minutes. Jones mentioned the nurse's statement to her supervisor Amber

10

Champagne-Wright, who appeared agitated but directed the relief nurse to substitute for a half hour.

According to Marietta Jones, nurses cannot safely transfer patient duties to another nurse for a break of two or three minutes in duration. Before the filing of suit, Jones never observed a registered nurse transfer patient responsibility to another nurse so that the first nurse could enjoy a respite.

During Marietta Jones' employment with Lourdes Medical Center, the hospital maintained a policy of one unpaid meal period during a twelve-hour shift. The hospital's Kronos system allowed only one deduction for a lunch during a shift. Management never informed her to use the deduct button if she missed a meal. Jones encountered difficulty eating meals while working because of interruptions for emergencies. She could not leave the hospital for a meal without permission. The hospital utilized GWYN nurses to fill open shifts not to relieve nurses for meal or rest periods.

Plaintiff Kathleen Christianson has worked for Lourdes Medical Center for over twenty-six years and exclusively in the intensive care department since 2005. She previously worked in all units, but the operating room unit. Lourdes also assigned her to serve as its first cover or GWYN nurse. Nevertheless, according to Christianson, a GWYN nurse substituted for an absent or ill nurse and rarely relieved on duty nurses. The hospital never informed Christianson of unit specific policies regarding meal and rest breaks.

11

During her many years employed by Lourdes Medical Center, Kathleen Christianson has never enjoyed a meal off premises. During all of her meal breaks, she has responded to emergencies and doctor's instructions and answered questions from other nurses.

Kathleen Christianson testified that, before this suit, Lourdes Medical Center informed her she could take two paid fifteen-minute rest periods and one unpaid half hour meal break during a twelve-hour shift. Lourdes did not inform her she could report a missed break and receive compensation. She never received a second meal period during a twelve-hour shift. The hospital never informed her of the ability or right to exercise a second meal break.

According to Kathleen Christianson, no nurse ever covered her duties so that she could exercise a work break. Lourdes Medical Center never relieved her from any patient assignments during a shift. Contrary to the claim of Lourdes Medical Center, Christianson denied ever rejecting the opportunity to exercise a rest period. She often needed to return to work duties when taking a meal break.

Kathleen Christianson testified that Lourdes Medical Center constructed a policy after this lawsuit, under which policy the hospital instructs nurses to take intermittent rest breaks rather than full fifteen-minute breaks. According to Christianson, intermittent rest breaks do not allow a nurse to transfer patient responsibilities to another nurse. Intermittent breaks do not provide the relaxation needed during the course of a day.

12

Additional nurses signed declarations that echoed the testimony of the plaintiff nurses. Emergency room nurses Vicki Haines and Melanie Bell stated that they exercised no breaks. Conversely, other emergency room nurses testified that day and night shift registered nurses could usually take a thirty-minute uninterrupted meal period and rest breaks.

We now address testimony submitted by Lourdes Medical Center. The hospital's declarations focused on the difference between hospital departments and work shifts, although the declarations also addressed whether Lourdes violated wage laws. Plaintiff Marietta Jones, in her deposition, admitted a difference in the administration of breaks from department to department. We organize the hospital's evidence by hospital department.

Seventeen part-time and full-time registered nurses work in the emergency department at various times on eight or twelve-hour shifts. One nurse, generally the most experienced, serves as the charge nurse. The charge nurse assesses work-flow and patient placement and generally lacks patient assignments. Typically, one registered nurse works in triage, one to order supplies, and another to track patient care. The triage nurse also forgoes patient assignments, while the remaining nurses are assigned to rooms inside the department.

The emergency department nursing orientation includes discussing meal periods and rest breaks. Lourdes Medical Center does not identify ways in which the emergency

13

room's orientation regarding breaks may differ from other departments. Generally, a registered nurse notifies the charge nurse that he or she wishes a break, although each charge nurse administers meal periods and breaks differently.

The Lourdes Medical Center surgery department usually operates from 7:00 a.m. to 3:30 p.m., Monday through Friday, although emergency surgeries may occur at any hour. This department enjoys a predictable patient flow since the department schedules most surgeries in advance. A fixed schedule accommodates nurses' rest breaks and meal periods.

Eight full-time registered nurses work eight-hour shifts in surgery. Tasks of surgical nurses differ from duties of nurses in other departments. Surgeries require technical precision. Registered nurses work closely with surgeons and must hold highly specialized skills, including knowledge of surgical equipment. Typically, one nurse serves as a charge nurse, lacks patient assignments, and coordinates and covers breaks.

Surgery department nurse orientation includes discussion of meal periods and rest breaks. A surgical nurse rarely misses a meal and rest break, and, when missed, according to Lourdes Medical Center, the hospital compensates the nurse for the hospital missed time. The nurse notifies the charge nurse of a missed rest, and the charge nurse records the missed period on a white board. The charge nurse assigns three registered nurses for each two surgery rooms. A fifth registered nurse serves as a floating nurse, assists with patient care, and covers meal periods and rest breaks. During a lengthy

14

surgery, a surgical nurse will be relieved for a rest break or meal period.

Lourdes Medical Center also maintains a medical/surgery unit apparently separate from the surgical department. The medical/surgery unit remains open twenty-four hours a day, seven days per week and treats patients needing to stay at the hospital for over twenty-four hours. In this department, registered nurses perform routine physical assessments, administer medications, prepare patients for surgery, and monitor postsurgery patients for complications. The nurses may assist with patient mobility, dieting and toileting needs, check doctor orders, provide patient education and discharge instructions, assist registered nurse students, and record treatment. The medical/surgery unit experiences an unpredictable patient flow. Therefore, registered nurses coordinate breaks based on personal preference and patient care.

Full-time, part-time, and per diem registered nurses, typically on twelve-hour shifts, work in the medical/surgery unit. Nurses rotate into the role of charge nurse. The charge nurse has additional duties of patient admissions, assigning patients to other nurses, and assisting in scheduling. At night, registered nurses in the medical/surgery department routinely exercise meal and rest breaks since patients in the unit sleep. According to Lourdes Medical Center, some registered nurses in the unit waive meal periods on a regular basis despite coverage being offered.

The patient acute care unit operates in tandem with the surgery department by assessing surgical patients for pre-operative and intra-operative surgical care. Three full-

15

time and two part-time registered nurses work eight-hour shifts in the department. Registered nurses in the unit undergo department orientation that includes training about meal periods and rest breaks. According to Lourdes Medical Center, a nurse in the acute care department rarely misses rest breaks and meal periods.

The same day surgery/ambulatory/gastrointestinal laboratory, also known as the same day surgery department, functions from 6:00 a.m. to sometime between 3 p.m. and 6:30 p.m., depending on the day's completion of surgical procedures. This same day surgery department enjoys a predictable patient flow because the unit schedules most surgeries in advance. Nurses thereby experience predictable rest breaks and meal periods within set windows of time.

Seven full-time and three part-time registered nurses work in the same day surgery department. Although most work twelve-hour shifts, three nurses work eight-hour shifts, and one works two eight-hour shifts and two twelve-hour shifts.

The observation department functions twenty-four hours per day, seven days per week. Nevertheless, the department will temporarily close if it monitors no patients. The observation department monitors patients coming from the emergency room and surgery department and assists outpatients who undergo blood transfusions or receive antibiotics or intravenous fluids. Five full-time and one part-time registered nurse, all working twelve-hour shifts, labor in the observation department.

Dee Hazel managed the observation department until January 2012, when Teresa

16

Pleyo assumed management. Plaintiff Marietta Jones testified that the two had different management styles. Under Pleyo, Jones felt comfortable reporting if she missed a meal period.

The observation department provides training that covers department specific procedures, including meal periods and rest breaks. Under department procedures, a registered nurse must notify the charge nurse or coworkers of a break, but she does not require preapproval from the manager. The transfer of patient care to another registered nurse for meal periods or rest breaks in this unit is easier because the department serves lower acuity patients. This process differs at night since only one registered nurse works in the department during the night shift.

Except when the department's patient census is high, observation department nurses rarely miss rest breaks and meal periods. At night, observation patients usually sleep and require less direct patient care. Night shift nurses thereby enjoy more time to engage in personal activities. Of course, according to the nurses, a nurse remains laboring, despite engaging in personal activities, if she must respond to calls. According to Lourdes Medical Center, registered nurses in the observation department take breaks in small increments throughout the shift to chat about personal matters, check Facebook or e-mail, use cell phones, or otherwise relax.

The intensive care unit treats patients requiring higher level care. The department utilizes specialty equipment such as telemetry, respirators, central lines, and pacemakers.

17

Nurses monitor medications, monitor ventilators, oversee heavy sedation, manage drips, and engage in emergency protocol and care for critically ill patients.

Full-time, part-time, and per diem registered nurses work in the intensive care unit on twelve-hour shifts. One nurse serves as charge nurse on a shift. The charge nurse coordinates patient admissions, monitors cardiac equipment, and assists with scheduling. No registered nurse need be present in the unit if the unit houses no patient. Nevertheless, one patient requires the presence of two qualified registered nurses. An intensive care unit nurse can monitor only two patients at a time. In the absence of an intensive care department patient, unit nurses may monitor medical/surgical unit patients.

The number of intensive care unit patients varies from time to time. The unit usually houses one to two patients per day, and may go weeks without a patient. Staffing levels generally allow unit nurses to realize meal periods and rest breaks. The unit delivers a department specific orientation for registered nurses, and this orientation discusses target times and protocols for meal periods and rest breaks. When there are two intensive care unit registered nurses, breaks and meal periods can be taken.

According to Lourdes Medical Center, the required certification level for intensive care unit registered nurses complicates finding relief for meal periods and rest breaks with a high acuity patient, but another intensive care unit nurse is usually available to provide relief. Even on busy days, unit nurses generally enjoy time to take breaks, eat, go to the coffee shop, and text.

18

Cheryl Carr worked at Lourdes as supervisor of the intensive care unit. As manager, she allowed unit registered nurses to coordinate rest and lunch breaks as they wished. Most nurses insisted on taking breaks and lunches as they saw fit. As manager, she observed nurses exercising mini-breaks to socialize, drink coffee, and make personal phone calls. According to Carr, the small breaks totaled at least ten minutes for each four hours. The intensive care unit was not as busy as other departments and allowed more breaks for nurses. Some unit nurses refused a thirty-minute meal and instead preferred to eat periodically. Plaintiff Kathy Christianson often refused a thirty-minute lunch break, and Carr often reminded her to exercise the full break.

Suzanne Hannigan serves as Lourdes Medical Center Director of Nursing Services. She supervises at least thirty-three nurses. Hannigan fears that nurses in the intensive care unit formed a belief that they cannot take breaks or meal periods. Hannigan does not know the source of this belief. Management has never told nurses that they may not exercise breaks. When Hannigan learns that a nurse missed a meal period, she instructs the nurse to cancel the meal deduct or inform payroll.

The inpatient rehabilitation department serves inpatients needing intense rehabilitation following surgery or trauma. Patient flow is predictable. Registered nurses in the department perform standard nursing tasks such as checking vitals, medication management, handling intravenous lines, and assisting with patient transfers.

During most months, the inpatient rehabilitation department employs four full-

19

time registered nurses and three per diem registered nurses, all whom work twelve-hour shifts. The unit designates one working nurse as the charge nurse. The department may assign other registered nurses to assist with trauma patients. On Tuesdays and Thursdays, unit nurses attend staff meeting and family rounds. The night nurses on Mondays also perform chart reviews for Tuesday staff meetings.

According to Lourdes Medical Center, rehabilitation registered nurses undergo a department specific orientation that covers meal periods and rest breaks, although the hospital identified no differences from other departments. Nurses plan meal periods and rest breaks at the onset of each shift. Rehabilitation nurses remain busy from 8 to 10 a.m. and around meal times. Work slows in the inpatient rehabilitation unit by mid-morning and between 1:00 p.m. and 4:30 p.m. because patients leave the department for therapy. Registered nurses working night shift begin with a couple of hours of patient assessment and care, but then patients sleep and require little attention. As a result, nurses working in the rehabilitation department enjoy lengthy periods of downtime without patient care or responsibilities. During this time, they chat about personal matters, use the internet, go to the espresso bar or gift shop, make personal calls, or read.

The obstetrics and birthing unit closed in June 2013. Until that month, the department remained open twenty-four hours a day, seven days per week. The obstetrics department cared for laboring mothers and postpartum mothers and babies. The department saw unpredictability because of unscheduled births. Sometimes, the unit

20

experienced weeks without a patient and then assisted numerous laboring mothers simultaneously.

Eleven full-time and two part-time registered nurses worked at various times in obstetrics, all on twelve-hour shifts. The unit maintained a daily minimum staff of four nurses regardless of whether patients were present. One registered nurse acted as a charge nurse and assisted in operation of the department. The charge nurse assigned tasks such as checking crash carts, refrigerators, the warmer, and the C-section room, mailing phenylketonuria data, ensuring the placement of all reports in patient charts, and addressing concerns from physicians. Ideally, two registered nurses engaged in labor and delivery, while other nurses delivered postpartum patient care.

Each obstetrics registered nurse received department training when meal periods and rest breaks were discussed. Typically, a registered nurse informed the charge nurse if he or she wished a break and gave a report about any patient status to the covering nurse.

Due to the relatively low numbers of patients served and core staffing levels, registered nurses in Lourdes Medical Center obstetrics unit experienced prolonged periods of idle time, during which they performed tasks unrelated to work. Registered nurses ate a second meal together on a slow day. Some obstetrics nurses even covered breaks and meal periods for registered nurses in other departments. Even on days with patients, registered nurses in obstetrics could take small breaks, for at least ten minutes per half day, to use cell phones, check e-mail, read magazines, get coffee, and grab

21

snacks.

Amber Champagne-Wright, a Lourdes Medical Center supervisor, signed a declaration representative of other declarations signed by Lourdes managers and supervisors. Managers, supervisors and other employees discussed, in their respective declarations specific timing as to when they exercised lunch and other breaks. They testified to canceling the automatic deduct function in the Kronos time management system on the rare occasion when they missed a meal. They mentioned the difference between a calm night shift and a day shift and dissimilarities between departments.

Amber Champagne-Wright averred that, since 2004, she has overseen several Lourdes departments including the emergency room, ambulatory unit, observation department, surgery room, labor and delivery unit, rehabilitation department, and medical unit. Fifteen to twenty nurses work per shift. According to Champagne-Wright, registered nurses, on a typical shift, received one thirty-minute unpaid lunch during the first half of the shift. During the second half of any given shift, a registered nurse may eat food in his or her unit. The primary factors determining whether a registered nurse may eat during the second half of the shift is patient census and acuity of care needed.

Amber Champagne-Wright recognized that, when she eats a meal on a unit, she sometimes encounters interruptions. She returns later to finish her meal. All Lourdes' department nurses suffer these interruptions. Often times, despite the interruptions, she still accumulates thirty minutes for the second meal. Depending on how busy she is,

22

Champagne-Wright and other nurses may enjoy two hours to eat during the second half of the shift. The amount of time for a second meal break varies from shift to shift and department to department.

Amber Champagne-Wright has not suffered discipline or docked pay for exercising a second meal break. She encourages nurses that she supervises to have a second meal. Night shift nurses find it easier to enjoy a second full meal block. Obtaining a second meal break was more common in the obstetrics unit. Staffing requirements demanded nurses in the obstetrics unit at all times, even if no patients present. Nurses in the emergency room found it most difficult to obtain a second meal. Champagne-Wright claims that, on some units and shifts, registered nurses enjoy a half hour to two hours without active patient duties and during which they may pursue personal activities.

Amber Champagne-Wright testified to differences among units. Most same day surgery and ambulatory unit nurses work eight-hour shifts, while other nurses work twelve-hour shifts. The typical nurse works thirty-six hours per week. Some full-time nurses work overtime, while others rarely do. Part-time nurses rarely work overtime.

Amber Champagne-Wright testified that each new registered nurse undergoes orientation specific to his or her departments. Each department orientation includes instructions on meal periods and rest breaks. The charge nurse apprises each nurse to account for unit specific circumstances that may alter her ability to take a lunch or rest

23

break.

Amber Champagne-Wright testified that the duties of registered nurses vary between night and day shifts. Night nurses experience more free time. Because of this time, night nurses must review a patient's entire chart and ensure the accuracy of the chart. Registered nurse duties on weekend shifts echo the duties of a night shift nurse because of more free time and less distraction from the administration and physicians. According to Amber Champagne-Wright, Marietta Jones has refused a meal break.

Sara Barron served as the director of inpatient services from 2003-2010. Barron learned in the early 2000s of lawsuits by nurses in other hospitals over meal and rest breaks. Therefore, Barron diligently worked to ensure nurses obtained needed breaks.

According to Sara Barron, Judy Chavez refused to be relieved for lunch on several occasions. Chavez's brother-in-law usually brought and ate lunch with her. Barron claimed that Chavez made a significant number of personal calls during work hours. Chavez also frequently socialized with other employees. Her intermittent personal time would total at least ten minutes every four hours. Sara Barron also accused Marietta Jones of socializing and engaging in personal activity throughout a shift. Jones' personal time totaled ten minutes for every four hours worked.

Debra Hill works as Lourdes Medical Center's payroll coordinator. She trains new employees and new managers on the Kronos system. If an employee misses a break or meal, the employee may report the miss to a supervisor, who will contact Hill. Hill

24

will then adjust the payroll records.

According to Debra Hill, plaintiff Judith Chavez, after filing suit, contacted her supervisor about missing a break. The supervisor notified Hill, who added fifteen minutes to Chavez's work time. Plaintiff Oralia Garcia contacted Hill many times when she did not get paid correctly. Hill then reviewed Garcia's time and pay and entered any needed corrections. Hill expected Garcia to notify Hill of any missed lunches or breaks. She did not.

According to Debra Hill, plaintiff Kathy Christenson frequently contacted her about use of the Kronos system. Hill also expected Christenson to inform her of any missed breaks. Christenson did not. Plaintiff Marrietta Jones contacted Hill when Jones lost a Kronos password or had a question about pay. Jones never reported a missed break.

PROCEDURE

In June 2012, the nurses filed a complaint for unlawful withholding of wages and alleged that the hospital failed to provide nurses with rest periods and meal periods. In the original complaint, the nurses sought monetary, declaratory, and injunctive relief, in addition to class certification.

Effective March 10, 2013, Lourdes adopted a new accounting system. The system permits tracking of intermittent breaks, requires nurses to clock in and out for meal periods, and allows nurses to track missed rest periods.

25

In April 2013, the nurses filed a motion for class action certification. They sought a class of all registered nurses who worked at least one hourly shift at Lourdes Medical Center at Pasco from June 25, 2009 through the then present to litigate common liability questions related to the hospital's meal and break policies and practices. The nurses also alternatively proposed subclasses of nurses by shift or department. In response, Lourdes Medical Center filed affidavits by managers and supervisors that we quoted, in part, above. Lourdes argued that operational differences within its departments would cause difficulty in resolving damage questions.

After the trial court entertained initial arguments regarding class certification, the court astutely postponed a decision on the motion and offered the nurses an opportunity to present summary judgment motions to clarify the legal theories controlling Lourdes Medical Center's exposure to liability. The law encourages the trial court, for purposes of judicial economy, to delay ruling on a motion for class certification until after hearing dispositive motions. *Sheehan v. Central Puget Sound Regional Transit Authority*, 155 Wn.2d 790, 123 P.3d 88 (2005). At different times, the nurses then brought three summary judgment motions respectively relating to (1) nonmeal rest periods, (2) tracking time and paying for missed rest periods, and (3) the need for a second meal period during a twelve-hour shift. The trial court denied the nurses' motions for partial summary judgment. The court concluded issues of fact existed as to whether individual nurses were afforded time to take a meal break and whether individual nurses were relieved of

26

work in order to take a break. The ruling noted that availability of a meal break could depend on the shift worked by a nurse.

In March 2015, the nurses amended their complaint. The amendment continues to seek declaratory and injunctive relief. Nevertheless, the complaint notices Lourdes Medical Center's March 2013 change in meals and breaks time keeping policies. The nurses allege that "this lawsuit was a driving force in the policy change that allowed nurses a way to track missed rest periods and that they have already obtained a substantial, systemic victory on a class basis." CP at 1640. The amended complaint sought a requested class period for workers laboring before March 10, 2013.

Also in March 2015, the nurses renewed their motion for class certification for all registered nurses who worked at least one hourly shift at Lourdes Medical Center from June 25, 2009 through March 10, 2013, and, in the alternative, if necessary, to certify subclasses of these same nurses by department or shift hours. The trial court denied class certification. The court ruled that the nurses met the class certification requirements of CR 23(a) but not CR 23(b). In so ruling, the trial court found that the number of nurses was sufficiently large to render joinder impractical. The trial court also found that the potential class members' claims included common liability issues and that the class representatives shared common issues with the class. At the conclusion of the hearing, the trial court commented:

27

I still am going to deny the request for class certification because, in my mind, the class issues do not predominate. There are certainly some important class issues that are there and that exist, but, when the rubber meets the road, what happens from shift to shift, from nurse to nurse, from nurse type to nurse type, from census to census and so on, and so on it goes, if we had a class the generalities of what happened at Lourdes or what happens at Lourdes, I believe, would consume and overrun the specifics.

. . . .

It does appear to me that virtually—well, I'll say all of the other requirements of CR 23 are met, but just not those—not those three, that way I've made a ruling on all of the subparts.

Report of Proceedings (RP) at 406-07. The order denying class action certification reads,

in part:

5. The Court finds plaintiffs have not met the required showing that a mandatory class action would be maintainable under CR23(b)(1) because the primary objective of this lawsuit is monetary damages and plaintiffs have failed to show prejudice to absent class members would occur.

6. The Court finds plaintiffs have not met the required showing that a mandatory class action would be maintainable under CR 23(b)(2) because the primary objective of this lawsuit is monetary damages and plaintiffs have failed to establish the necessity of declaratory or injunctive relief.

7. The Court finds plaintiffs have not met the required showing that a class action would be maintainable under CR 23(b)(3). The Court finds that common class issues do not predominate over individual questions because issues regarding shift, nurse type, nurse roles and job duties, patient assignments and census, managers, and department cause the specifics for each class member to overrun any generalities. The Court also finds that a class action is not superior to alternatives such as joinder or individual lawsuits for fair and efficient adjudication of the claims. Finally, the Court also finds that the proposed class, or the proposed nine subclasses by department, would be unmanageable at trial.

CP at 1011-12. We accepted discretionary review of the order denying class

certification.

## LAW AND ANALYSIS

The nurses contend the trial court erred in some of its summary judgment rulings. We did not accept discretionary review for the purpose of reviewing summary judgment rulings and will not directly address any such rulings. We note that the law instructs courts not to decide the merits of claims when ruling on class certification requests. *Washington Education Association v. Shelton School District No. 309*, 93 Wn.2d 783, 790, 613 P.2d 769 (1980).

In challenging the trial court's order denying class certification, the nurses argue on appeal that the trial court failed to liberally construe CR 23 in favor of certification, the trial court failed to enter sufficient factual findings to justify denial of certification, the trial court implicitly and erroneously found facts against them without conducting an evidentiary hearing, the trial court erroneously required them to prove their case as a matter of law, and the trial court erroneously required them to prove damages before certification or discovery. We will not discretely address each argument, although we reject each argument. We will address some of the arguments during the flow of our analysis.

Lourdes Medical Center responds that the trial court acted within its discretion because the court conducted a rigorous analysis of the class certification requirements. The hospital also argues that individual issues predominate with each of the nurses' theories of liability and that common issues do not control as required for certification

29

under CR 23(b)(3). Additionally, the hospital asserts that the trial court correctly determined the class failed to meet CR 23(b)(3) because the class was unmanageable.

The plaintiff nurses and Lourdes Medical Center forward conflicting facts, including facts important to determining whether to grant class certification. The parties disagree as to the exercise of breaks by the plaintiff nurses, the extent to which Lourdes Medical Center trained workers about meal and rest breaks, the difference in any training and polices from department to department, whether the work atmosphere was conducive or hostile to exercising breaks, the extent of differences with regard to the exercise of breaks from department to department, from shift to shift, and from supervisor to supervisor, the availability of coverage for breaks from department to department and shift to shift, the various reactions of managers to the reporting of missed breaks and meals, the extent to which twelve-hour workers received a second meal, the magnitude of intermittent breaks, whether one or more nurses waived breaks, whether Lourdes paid nurses for missed breaks and meals, and to what extent, if any, does the hospital owe the plaintiff nurses money.

We determine that we must review the facts in a light most favorable to Lourdes Medical Center. We find no case that explicitly directs us to view the facts in such a gloss for purposes of reviewing a class action ruling, but logic and other tangential rules compel such a conclusion. A reviewing court must defer to the trial court's findings of fact entered when certifying or denying certification. *Duncan v. Michigan*, 300 Mich.

App. 176, 832 N.W.2d 761, 766 (2013). Although our trial court did not expressly resolve conflicts in the evidence, the court must have done so when issuing its decision. Plaintiff nurses complain that the trial court resolved conflicts in Lourdes' favor. This resolution of the conflict would have included some determination of the credibility of the respective evidence presented by the parties. We must assume the hospital's testimony to be accurate or else we do not bestow full deference to the court's ruling favoring the hospital. After a bench trial, we view the evidence in the light most favorable to the winning party. *City of Walla Walla v. $401,333.44*, 164 Wn. App. 236, 256, 262 P.3d 1239 (2011). Even when the trial court issues a ruling based on affidavits, we view the evidence in favor of the prevailing party if the trial court weighed credibility of declarants. *In re Marriage of Rideout*, 150 Wn.2d 337, 350, 77 P.3d 1174 (2003).

The nurses contend that the trial court should have conducted an evidentiary hearing. In support of this argument, the nurses cite only *Oda v. State*, 111 Wn. App. 79, 93 n.4, 44 P.3d 8 (2002). The passage in *Oda* contrarily rejects the nurses' contention. The passage reads that many courts encourage an evidentiary hearing, but no court has held that an evidentiary hearing is required on the question of class certification. *Oda v. State*, 111 Wn. App. at 93 n.4.

The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. *Comcast Corp. v Behrend*, 569 U.S. __, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013). The purposes of class actions include

31

the saving of members of the class the cost and trouble of filing individual suits and the

freeing of the defendant from the harassment of identical future litigation. *Brown v.*

*Brown*, 6 Wn. App. 249, 256-57, 492 P.2d 581 (1971). Despite the law seeking to, in

part, benefit defendants, defendants, more often than plaintiffs, oppose class certification.

In Washington State, CR 23 governs a determination of whether to certify a class

action. Nevertheless, because CR 23 mirrors its federal counterpart, cases interpreting

the analogous federal provision are highly persuasive. *Schnall v. AT&T Wireless*

*Services, Inc.*, 171 Wn.2d 260, 271, 259 P.3d 129 (2011). Because class actions are a

specialized proceeding available in limited circumstances, the trial court must conduct a

"rigorous analysis" of the CR 23 requirements to determine whether a class action is

appropriate in a particular case. *Oda v. State*, 111 Wn. App. at 93 (2002). Plaintiffs

seeking class certification bear the burden of demonstrating that they meet all the

requirements of CR 23. *Weston v. Emerald City Pizza, LLC*, 137 Wn. App. 164, 168, 151

P.3d 1090 (2007). Class actions are specialized types of suits, and, as a general rule,

must be brought and maintained in strict conformity with the requirements of CR 23.

*Lacey Nursing Center, Inc. v. Department of Revenue*, 128 Wn.2d 40, 47, 905 P.2d 338

(1995); *DeFunis v. Odegaard*, 84 Wn.2d 617, 622, 529 P.2d 438 (1974).

This court reviews a trial court's decision to certify a class for abuse of discretion.

*Miller v. Farmer Brothers Co.*, 115 Wn. App. 815, 820, 64 P.3d 49 (2003); *Oda v. State*,

111 Wn. App. at 90. When this court reviews a trial court's decision to deny class

certification, the decision is afforded a substantial amount of deference. *Schnall v. AT&T Wireless Services, Inc.*, 171 Wn.2d at 266. A court abuses its discretion if its decision is based on untenable grounds or is manifestly unreasonable or arbitrary. *Oda v. State*, 111 Wn. App. at 91. We generally review decisions certifying a class liberally and err in favor of certifying a class, since the class is always subject to later modification or decertification by the trial court. *Miller v. Farmer Brothers Co.*, 115 Wn. App. at 820; *Brown v. Brown*, 6 Wn. App. at 256 (1971). An appellate court resolves close cases in favor of allowing or maintaining the class. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 188-89, 157 P.3d 847 (2007); *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 319, 54 P.3d 665 (2002).

We wonder if two of these principles conflict. If we are to defer to the trial court's decision, we question whether we should resolve close cases by approving a class action when the trial court denied certification. The gist of affording a trial court discretion is to affirm the trial court in close calls.

We will reverse a class certification decision if the trial court made its decision without appropriate consideration and without articulated reference to the criteria of CR 23. *Washington Education Association v. Shelton School District No. 309*, 93 Wn.2d at 793. We will not disturb a trial court's certification decision if the record indicates the court properly considered all CR 23 criteria. *Nelson v. Appleway Chevrolet, Inc.*, 160

Wn.2d at 188. Our record shows that the trial court considered all criteria. In fact, the

trial court ruled in favor of the plaintiff nurses in all but one CR 23 requirement.

CR 23 divides itself into two sections: CR 23(a), which lists four prerequisites for

all class actions; and CR 23(b), which lists three alternative requirements, only one of

which need apply. CR 23(a) declares:

> **Prerequisites to a Class Action.** One or more members of a class
> may sue or be sued as representative parties on behalf of all only if (1) the
> class is so numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or defenses
> of the representative parties are typical of the claims or defenses of the
> class, and (4) the representative parties will fairly and adequately protect
> the interests of the class.

Under CR 23(a), the plaintiffs must satisfy the four prerequisites of

(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of the representatives.

*Admasu v. Port of Seattle*, 185 Wn. App. 23, 30-31, 340 P.3d 873 (2014), *review denied*,

183 Wn.2d 1009, 352 P.3d 187 (2015). We do not address whether the nurses fulfilled

all requirements of CR 23(a). The trial court found that the nurses' suit fulfilled all four

requirements of the subsection, and Lourdes Medical Center does not challenge this

ruling on appeal.

In addition to CR 23(a), the plaintiff must meet the requirements of one of the

subparagraphs in subsection CR 23(b). This subsection reads:

> **Class Actions Maintainable.** An action may be maintained as a
> class action if the prerequisites of section (a) are satisfied, and in addition:

34

(1) The prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest; or

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Although the nurses argue that class certification was appropriate under any of the three subsections of CR 23(b), certification under CR 23(b)(1) and (2) applies only when the primary claim is for injunctive or declaratory relief. Under CR 23(b)(1) and (2), monetary relief must be incidental to the declaratory relief. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d at 189 (2007).

Our trial court ruled that plaintiff nurses did not meet CR 23(b)(1) because plaintiffs' primary recovery is monetary damages. Although the nurses originally

35

requested injunctive relief, the focus of their claims has been payment for unpaid meal and rest periods. After the nurses filed suit, Lourdes Medical Center ended the practice of utilizing the Kronos system and no longer automatically deducted time for meal breaks. Given this substantial, systemic victory, the nurses need no declaratory or injunctive relief. The nurses may still seek a declaratory ruling with regard to what constitutes a break during acute care when the hospital assigns a nurse to a particular patient. Still the trial court did not abuse its discretion by ruling the nurses' action primarily seeks monetary relief and does not meet the requirements of CR 23(b)(1) or (2).

On appeal, the parties aptly focus their briefing and analysis on whether the trial court correctly denied class certification under CR 23(b)(3). To repeat, CR 23(b)(3) allows certification when:

> The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

To restate the rule, class certification is appropriate under CR 23(b)(3) if common questions of fact or law predominate over individual ones and a class action is superior to other available methods of adjudication. *Sitton v. State Farm Mutual Automobile Insurance Co.*, 116 Wn. App. 245, 253, 63 P.3d 198 (2003). Plaintiffs seeking class certification under subsection (3) must show both predominance and superiority. *Admasu v. Port of Seattle*, 185 Wn. App. at 31 (2014).

36

Our trial court denied certification on a lack of both predominance and superiority. Since both must prevail, we address only superiority. The trial court determined that certification of the class would be unmanageable because of the confusion that could arise from trying to manage nine subclasses. The trial court believed that nine subclasses would be essential because of the differences in the respective hospital departments.

Even if individualized issues predominate, CR 23(b)(3) also requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. *Schnall v. AT&T Wireless Services, Inc.*, 171 Wn.2d at 275 (2011). Under the rule, a class action must be superior, not just as good as, other available methods. *Schnall v. AT&T Wireless Services, Inc.*, 171 Wn.2d at 275. The superiority requirement focuses on a comparison of available alternatives. *Schnall v. AT&T Wireless Services, Inc.*, 171 Wn.2d at 275; *Sitton v. State Farm Mutual Automobile Insurance Co.*, 116 Wn. App. at 256. In traditional statewide class actions, these alternatives include joinder, intervention, or consolidation. *Schnall v. AT&T Wireless Services, Inc.*, 171 Wn.2d at 275.

Manageability is only one of the elements that goes into the balance to determine the superiority of a class action in a particular case. Other factors must also be considered, as must the purposes of CR 23, including: conserving time, effort and expense; providing a forum for small claimants; and deterring illegal activities. *Sitton v. State Farm Mutual Automobile Insurance Co.*, 116 Wn. App. at 257. The trial court is

particularly in the best position to address case management concerns. *Sitton v. State Farm Mutual Automobile Insurance Co.*, 116 Wn. App. at 256-57.

At oral argument, the nurses' counsel commented that individual nurse claims could vary between $2,000 and $15,000. Class actions seek to render claims of small amounts easier to litigate. Nevertheless, we note that, as an alternative to a costly superior court class action suit, nurses seeking $5,000 or less could litigate in the inexpensive small claims court. RCW 12.40.010. We further observe that the trial court best knows the ability of the Franklin County Superior Court's ability to manage a class action process and trial.

We note common questions with regard to liability of Lourdes Medical Center for at least many of the nurses. The common issues include what constitutes a rest period in the context of nursing? Do intermittent rest periods comply with the law's demand for a fifteen-minute rest period each four hours of work? To what extent must the employer monitor whether employees receive breaks? Must the hospital have provided a second meal during a twelve-hour shift, and, if so, could the nurse waive the meal? We note, however, that Lourdes Medical Center has not conceded any illegal activities.

Plaintiff nurses may argue a court should certify a class action solely on the ground that the suit contains common issues of law. Nevertheless, the trial court must weigh the commonality with other factors before determining predominance. Also, we base our decision on the superiority prong not the predominance prong.

38

The plaintiff nurses rely on *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016), wherein the nation's high Court affirmed the trial court's certification of an employees' class action suit against an employer because the employees failed to garner statutorily mandated overtime pay for time spent donning and doffing protective equipment. A major distinction between *Tyson Foods* and this appeal, of course, is that the *Tyson Foods'* trial court exercised its discretion in granting class status. Another distinction concerns the variable among workers' activities, on which the employer sought to avoid certification. Tyson Foods argued that differences in the composition of gear worn by various employees caused a variation in the amount of time to don and doff the gear. The variables concerning Lourdes Medical Center nurses' ability to exercise breaks are greater. Each nurse's story will vary such that her story can fill one trial. Retelling those scores of stories in one case could be unmanageable.

In *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846 (N.D. Ohio 2013), nurses and nursing assistants brought action against a provider of medical and rehabilitative care and alleged violations of the federal Fair Labor Standards Act, 209 U.S.C. §§ 201-219. The employer also utilized the Kronos time system, with an automatic deduct function, for work hours accounting. Employees complained that they often did not break for lunch and the employer did not compensate them for the deducted time. The case involves a unique statute for class actions under the Fair Labor Standards Act. Nevertheless, the substantive rules echo the requirements of Fed. R. Civ. P. 23 and any

difference in the rules benefit the employees. The trial court denied class certification. Although the facts involved workers employed at numerous facilities, the court also noted the ability to exercise uninterrupted breaks depended on the nurse's unit, shift, manager, patient population, job duties, and individual habits. The court recognized the desirability of the nurses pooling resources to seek vindication of employment rights. Nevertheless, the court considered a class action unmanageable because each nurse's right to compensation hinged on his or her individual experience.

We note that at least one decision, *Perez v. Safety-Kleen Systems Inc.*, 253 F.R.D. 508 (2008), likely disagrees with the court's ruling in *Creely v. HCR ManorCare Inc.* Differing decisions, however, bolster the need to afford the trial court discretion in its ruling. The trial court's role remains to assess factors relevant to a decision and weigh those factors in accordance with the idiosyncrasies of the circumstances.

Our trial court's ruling echoed the concerns expressed by the federal court in *Creely v. HCR ManorCare Inc.* At least under the evidence presented by Lourdes Medical Center, the duties and experiences performed by one nurse, even as to nurses working in one hospital department, cannot be generalized. Thus, the trial court did not abuse its discretion in denying class certification.

## CONCLUSION

We affirm the trial court's order denying class certification. We remand the case to the superior court for further proceedings.

No. 33556-9-III
*Chavez v. Our Lady of Lourdes Hosp.*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.

41